# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

TANYA WEYKER,

     Plaintiff,

v.

                                       Case No. 14-CV-782-PP

DEPUTY JOSEPH QUILES,
DEPUTY SCOTT GRIFFIN,
DEPUTY BYRON TERRY,
SGT. MATTHEW PARADISE,
SHERIFF DAVID CLARKE, JR., and
MILWAUKEE COUNTY,

     Defendants.

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS

NOW COMES, the Plaintiff, Tanya Weyker, and her undersigned attorneys, and submits this Memorandum in Support of Attorney's Fees and Costs.

Dated at Oak Creek, Wisconsin, this 19th day of June, 2015

                                  MARTIN LAW OFFICE, S.C.
                                  Attorneys for Plaintiff Tanya Weyker

                                  /s/ Drew J. De Vinney

                                  Kevin R. Martin
                                  State Bar No. 01045748
                                  Drew J. De Vinney
                                  State Bar No. 01088576

## INTRODUCTION

In the present case, the plaintiff brought claims against the defendants for damages arising under 28 U.S.C. § 1983. On February 19, 2015, the defendants collectively presented plaintiff with a Rule 68 Offer of Settlement, which provided for the payment of reasonable attorney's fees, to be determined by the court if the parties were unable to stipulate to an amount. The plaintiff accepted the defendants' offer on February 26, 2015. However, the parties were subsequently unable to stipulate to plaintiff's attorney fees, and the matter is now before this court.

## BACKGROUND

### I.   THE BASIS FOR MS. WEYKER'S CLAIMS AGAINST THE DEFENDANTS

The Court has not yet had the opportunity to hear the alleged facts of the case outside of those raised in the pleadings. Plaintiff believes that a brief recitation of the factual basis of the underlying claims may provide useful context to the court in its evaluation of the present fee dispute.

#### A.   The Accident

On February 20, 2013, Plaintiff, Tanya Weyker, was driving southbound on Howell Avenue with the right of way, and her lights on. (Complaint, Document 1, at ¶ 7-8). At the same time, Defendant, Deputy Joseph Quiles, who was on duty as a deputy of the Milwaukee County Sheriff's Office, was traveling westbound on Hutsteiner Dr. toward Howell Avenue, when he disobeyed a stop sign and collided his cruiser into the driver's side of Ms. Weyker's car. (Id. at ¶ 5, 10-14). Ms. Weyker suffered severe injuries in the collision, including multiple neck fractures. (Id. at ¶ 15).

2

## B.     The Arrest

Following the collision, Detectives Scott Griffin, Byron Terry, and Sergeant Matthew Paradise of the Milwaukee Sheriff's Department responded to the scene. (See Id. at ¶ 17). Upon arriving at the scene, by Dep. Byron Terry, spoke with Ms. Weyker. (Aff. of Drew J. DeVinney at ¶ 7, ex. 1, Dep. Terry Incident Report at 1)[1]. After speaking with Ms. Weyker, Dep. Terry informed either Dep. Griffin or Sgt. Paradise that he believed that Ms. Weyker may be intoxicated. (See Id.; Aff. of Drew J. DeVinney, ¶ 8. Ex. 5, Griffin Depo. at 33:20-34:4). Sergeant Paradise, the ranking officer on scene at the time, wanted to delay an OWI investigation. (Griffin Depo at 34:24-35:23). However, Dep. Griffin took it upon himself to obtain permission to investigate Ms. Weyker for intoxication from Captain Colin Briggs over the radio. (Id.). At approximately 11:51 PM, Captain Briggs authorized Dep. Griffin to investigate Ms. Weyker for possible intoxication, and the accident report was assigned to Officer James Johnson of the City of Milwaukee Police Department. (See Aff. of Drew J. DeVinney, ¶ 12, Milwaukee County Sheriff's Office Audio Transmissions taken at 23:50).[2] At approximately 11:56 PM, within six minutes of beginning his investigation, Dep. Griffin announced that he had

---

[1] All exhibits are attached and indexed for the Court in the supporting affidavit of Drew J. DeVinney.

[2] The following radio conversation occurred at 23:50, and was provided by defendants during discovery:

Person One: "Hey boss you there, it's Griff."
Person Two: "Yeah go ahead."
Person One: "This one's a possible. Do you want me to take this instead of the city, and they can do the accident?"
Person Two: "Yeah if that's the case, uh, do we got a camera squad there?"
Person One:  "We have a camera down here, I don't know if the car is on scene or not. MPD's on scene. Um.."
Person Three: "Just wanted you to clear it to make sure that was ok. But, uh, I feel more comfortable taking that part of it if they want to do the crash if you are ok with it.
Person One: "Yeah I'm ok with it. I'll be there in about 3 minutes. Uh, just make sure we got a camera out there so we can take photos.
Person Two: "Copy that, I'll double heck with 406 to make sure that's getting done and I'll start my investigation on the other part."

arrested and placed Ms. Weyker in custody for unreasonable and imprudent speed, operating while intoxicated, operating with a prohibited alcohol content greater than 0.7 but less than 1.0 (1st), causing injury while operating while intoxicated, and causing injury while operating with a prohibited alcohol content. (Id.; Aff. of Drew J. DeVinney, ¶ 8, Ex. 2, Dep. Griffin Incident Report at 5).

As to the grounds for arresting Ms. Weyker, Dep. Griffin testified that he relied on the statements given by Ms. Weyker, her passenger, and Dep. Quiles during his OWI investigation. (Dep. of Scott Griffin, at 37:20-22). Dep. Griffin testified that Dep. Quiles informed him at the scene that he had stopped at the sign before proceeding to turn left onto South Howell Avenue, and that Ms. Weyker came out of nowhere and was travelling 45 miles per-hour and did not have her headlights on. (Id. at 39:15-24, 41:5-15). Dep. Griffin also testified that he could detect the light odor of alcohol on Ms. Weyker's breath, that her speech was slurred, and that her eyes were glassy and red. (Id. at 50:3-5). Dep. Griffin stated that he does not recall asking Ms. Weyker whether she had experienced any head trauma. (Id. at 54:6-9). However, he was aware that Ms. Weyker had been injured in the crash. (Id. at 61:14-15).

After she was arrested, Ms. Weyker was stabilized and transported by ambulance to the hospital, where she was diagnosed with multiple neck fractures. (Aff. of Drew J. DeVinney, ¶ 13, Ex. 6, Weyker Depo. at 48:3-49:19, 68:5-14). Dep. Griffin met Ms. Weyker at the hospital and spent the next several hours with her finishing his investigation. (Griffin Depo at 76:1-17). Multiple officers accompanied Ms. Weyker at all times during her custody at the hospital, even as her clothing was cut off by hospital staff. (Weyker Depo. at 50:6-15; 51:1-52). During her custody, Ms. Weyker was not allowed any visitors. (Id.). Dep. Griffin obtained consent from Ms. Weyker for a blood draw, which was performed at the hospital. (Dep. of Scott Griffin at 67:17-

19). Ms. Weyker spent approximately fifteen to sixteen hours in custody, with a Milwaukee Sheriff's Office Deputy by her side at all times, until her bail was paid by her father in the afternoon of February 21, 2013. (See Weyker Depo. at 51:1-3, 52:4-7). Ms. Weyker denied that she drank more than five sips of alcohol and was intoxicated prior to the collision. (See Weyker Depo at 85:20-87:20).

### C. Aftermath of Ms. Weyker's Arrest

On July 25, 2015, the results from Ms. Weyker's blood test came back completely negative for the presence of alcohol and drugs. (Aff. of Drew J. DeVinney, ¶ 14, ex. 7, Wisconsin State Laboratory of Hygiene July 25, 2013 Laboratory Report). In February of 2014, the district attorney's office informed Ms. Weyker that the charges had been dropped. (Weyker Depo. at 55:6-19).

### D. Reports filed by Deputies of the Milwaukee County Sheriff's Office

Deputy Quiles completed a report, six days after the collision, on February 26, 2013. (Aff. of Drew J. DeVinney, ¶ 9, ex. 3, Dep. Quiles Incident Report at 1). In his report, Dep. Quiles indicated that he stopped at the stop sign at W. Howell Avenue, looked both ways for oncoming traffic, checked his blind spot, and did not observe any oncoming traffic before he continued into the median when he was suddenly struck by Ms. Weyker's car. (Id. at 2).

Deputy Terry completed a report of the collision on February 21, 2013. Dep. Terry Incident Report at 1). In his report, Dep. Terry indicated that he first spoke with Deputy Quiles, and then with Ms. Weyker and her passenger. (Id.). Dep. Terry wrote that, while speaking with Ms. Weyker, he could smell a slight odor of an alcoholic beverage from her breath, that her eyes were red and glassy, and that her speech was slightly slurred. (Id.). He also stated that he

5

informed Sgt. Paradise that he could smell alcohol on Ms. Weyker's breath and that he believed that "she may be a possible OWI." (Id. at 2).

Deputy Griffin also completed a report on February 21, 2013. (Dep. Griffin Incident Report at 1). Dep. Griffin stated in his report that he could also smell the odor of "an alcoholic beverage" on Ms. Weyker's breath, that her speech was slurred, and that her eyes were glassy and bloodshot. (Id. at 2). Dep. Griffin stated that Ms. Weyker told him that she drank "half of a mixed drink." (Id.). Dep. Griffin further wrote that Ms. Weyker clarified that she drank five sips of a mixed drink. (Id.). Dep. Griffin did not indicate in his police report that he first spoke with Dep. Quiles at the scene. (See, e.g., Id.).

Contrary to Dep. Quiles' statements at the scene and in his report, video taken from the nearby airport showed that Dep. Quiles did not come to a complete stop prior to entering the intersection at W. Howell Avenue. (Aff. of Drew J. DeVinney, ¶ 15, ex. 8, Milwaukee County Sheriff Internal Affair's Investigation at 3). The Milwaukee County Sheriff's Office opened an internal investigation against Dep. Quiles, finding that Dep. Quiles failed to come to a complete stop and was the cause of the collision. (Id. at 4).

## II.    ERICKSON & OPPENHEIMER'S REPRESENTATION OF MS. WEYKER

In May of 2014, attorney Michael Oppenheimer contacted Ms. Weyker about representing her in her potential civil rights claim. (Aff. of Tanya Weyker, ¶ 2). On May 21, 2014, Ms. Weyker hired the law firm of Erickson & Oppenheimer, Ltd. to represent her in her civil rights claim against Defendants, Deputies Joseph Quiles, Scott Griffin, Byron Terry, Sergeant Matthew Paradise, Sheriff David Clarke, Jr., and Milwaukee County (See Aff. of Drew J. DeVinney, ¶ 28, Ex. 19, Erickson & Oppenheimer's Memorandum in Support of Attorney's Fees, Exhibit 1). During the course of representing Ms. Weyker, the attorneys at Erickson &

Oppenheimer performed a number of necessary and reasonable tasks, including drafting and filing of the complaint; performing legal research; requesting and reviewing discovery; communicating with Ms. Weyker and counsel for the defendants; and attending the depositions of Ms. Weyker, Dep. Quiles, and Dep. Griffin. (<u>See</u> Id.). Erickson & Oppenheimer's complete activity in this case is fully described in a separate fee petition that is attached as Exhibit 18 to Drew J. DeVinney's supporting affidavit.

In addition to Erickson & Oppenheimer, Ms. Weyker had also retained Attorney Todd Korb of Hupy & Abraham, S.C. to represent her with regard to the personal injuries she suffered in the subject collision. (Aff. of Tanya Weyker at ¶ 3). Ms. Weyker, through the representation provided by Mr. Korb, settled her personal injury case against Milwaukee County on November 4, 2014. (Aff. of Tanya Weyker at ¶ 3). Erickson & Oppenheimer continued to represent Ms. Weyker in her civil rights claims, and filed the complaint in the present action on July 8, 2014. (<u>See</u> Complaint, Document 1).

In early December of 2014, after depositions had taken place, the attorneys at Erickson & Oppenheimer advised Ms. Weyker that if the defendants were to make an offer of $5,000 to $15,000, she should accept it, because they believed that Ms. Weyker's false arrest claims would be defeated on motions based on her testimony that she traveling five miles an hour over the speed limit at the time of the collision. (Id. at ¶¶ 5, 6). Erickson & Oppenheimer informed Ms. Weyker that if she would be unwilling to accept that amount, they would file a motion to withdraw from her case. (Id.) Not wanting to settle for the hypothetical amount should it materialize, and knowing that Erickson & Oppenheimer would otherwise seek to withdraw, Ms. Weyker sought successor counsel. (Id. at ¶ 7).

## III.    DISCHARGE OF ERICKSON & OPPENHEIMER

On December 18, 2014, Ms. Weyker met with attorney Drew J. DeVinney at Martin Law Office, S.C. to discuss her present case. (Id.). Ms. Weyker later retained Martin Law Office, S.C. to represent her on December 22, 2014. (Aff. of Drew J. DeVinney, ¶ 18, ex. 11, December 22, 2014 Retainer Agreement).  Ms. Weyker subsequently discharged Erickson & Oppenheimer for cause on December 29, 2014. (Aff. of Tanya Weyker at ¶ 7). Specifically, Ms. Weyker gave the following grounds for discharging Erickson & Oppenheimer: (1) that Mr. Oppenheimer indicated that he would represent her, but she was only in regular contact with Attorneys Ronak Maisuria and Jon F. Erickson; (2) that Erickson & Oppenheimer failed to contact her for a scheduled telephone conference on December 19, 2014; (3) that despite her request, Erickson & Oppenheimer failed to inform her of the testimony elicited at the depositions in her case, and requested her to contact the court directly to order the transcripts; (4) that Erickson & Oppenheimer failed to prepare her for her deposition; and (5) that Erickson & Oppenheimer failed to communicate with her, generally, as to the developments of her case. (Aff. of Tanya Weyker at ¶ 8).

## III.   MARTIN LAW OFFICE'S REPRESENTATION OF MS. WEYKER

On January 12, 2015, Erickson & Oppenheimer filed a motion to withdraw as counsel for Ms. Weyker, indicating that Ms. Weyker had retained Martin Law Office. (January 12, 2015 Motion by Counsel for Plaintiff to Withdraw, Document 18). On January 13, 2015, Ms. Weyker sent to the defendants, and filed with this court, a substitution of counsel naming Martin Law Office, S.C. as successor counsel. (January 13, 2015 Substitution of Counsel, Document 19).

Upon being retained by Ms. Weyker, and knowing that there were looming dates, including a trial scheduled for July 20, 2015, Martin Law Office, S.C. immediately expended great effort into getting caught up with Ms. Weyker's case as quickly as possible. (See Aff. of

Drew DeVinney, ¶¶ 26-27, ex. 17, 18 Martin Law Office's Itemization of Attorney's Fees & Explanation of Communication Entries;[3] See also, September 24, 2014, Trial Scheduling Order, Document 13;).

On January 15, 2015, the attorneys for defendant Milwaukee County sent Martin Law Office transcripts of the depositions of Tanya Weyker, Scott Griffin, and Joseph Quiles. (Aff. of Drew J. DeVinney, ¶ 20, ex. 12, January 15, 2015 Correspondence from Whyte Hirschboeck Dudek, S.C.). Martin Law Office immediately began reviewing the depositions, along with the files provided by Ms. Weyker. (See Martin Law Office's Itemization of Attorney's Fees). Martin Law Office finally received Erickson & Oppenheimer's file on January 26, 2015, and began reviewing those documents as well. (See Id. at 1). In addition to expending time to simply get up to speed on Ms. Weyker's case—which included reviewing thousands of pages of discovery and testimony, as well as hours of audio and video recordings—Martin Law Office conducted its own independent legal research on various issues related to Ms. Weyker's case; communicated extensively with Ms. Weyker, defense counsel, and other interested parties; and coordinated with multiple potential experts. (Id.; Explanation of Communication Entries). These and all other steps taken by Martin Law Office are fully addressed in Martin Law Office's Itemization of Attorney's Fees and Explanation of Communication Entries, which are attached as Exhibits 17 and 18 to the Affidavit of Drew J. DeVinney. (Id.).

## IV.     DEFENDANT'S RULE 68 OFFER OF JUDGMENT

On February 19, 2015, the defendant's sent Martin Law Office an offer of judgment pursuant to Rule 68. (Aff. of Drew J. DeVinney, ¶ 21, Ex. 13, Defendants' Rule 68 Settlement Offer). The Rule 68 Settlement Offer specifically stated:

---

[3] Exhibit 27, Explanation of Communication Entries is a companion document to Martin Law Office's Itemization of Attorney's fees. It should be noted that this information was not previously provided to the defendants, because

> Plaintiff may have judgment against defendants, collectively, for the total sum of Thirty Thousand and 00/100 Dollars ($30,000) plus taxable costs incurred to date as allowed under the Federal Rules of Civil Procedure (said costs to include reasonable attorneys fees incurred to date as allowed under 42 U.S.C. § 1988 in an amount to be determined by the Court if a stipulation as to that amount cannot be reached by all parties).

At no point between Erickson & Oppenheimer's motion to withdraw on January 12, 2015 and Defendant's offer of judgment on February 29, 2015, did the parties discuss the possibility of settling Ms. Weyker's claims, despite multiple communications between the firms on other matters. (See Aff of Drew J. DeVinney at ¶ 19; See Martin Law Office's Itemization of Attorney's Fees). Further, nothing in Erickson & Oppenheimer's file indicated that the parties had previously discussed the possibility of settlement, and Ms. Weyker was unaware that any settlement was forthcoming. (Aff. of Drew J. DeVinney at ¶ 23; Aff. of Tanya Weyker at ¶ 8). After careful consideration and discussions with the attorneys at Martin Law Office about the facts of her case, and in light of the risks involved, Ms. Weyker accepted the offer of judgment on February 26, 2015. (Plaintiff's Notice of acceptance of Defendants' Rule 68 Settlement Offer; Aff. of Tanya Weyker at ¶ 9).

## V.    THE PRESENT FEE DISPUTE

At a previously scheduled conference on March 18, 2015, the parties confirmed to the Court that Ms. Weyker had accepted a Rule 68 settlement offer by all defendants. (March 18, 2015 Minutes, Document 23). The Court was informed that the offer provided for attorney's fees, and the Court granted defendants sixty days to review the plaintiff's fee petitions and resolve any disputes. (Id.). Defendants also agreed to pay Ms. Weyker the settlement award without delay. (Id.).

Plaintiff sent defendants a request for fees and costs on March 17, 2015. (Aff. of Drew J. De Vinney, ¶ 24, ex. 15, Erickson & Oppenheimer's Memorandum in Support of Attorney's

---

counsel did not want to unnecessarily risk betraying the plaintiff's expectation of attorney-client confidentiality.

Fees). Erickson & Oppenheimer claimed total attorney's fees of **$46,318.75**, and costs of **$1,134.99**. (Id. at 2). Martin Law Office claimed attorney's fees of **$24,337.50** and costs of **$1,785.34**. (Id.). Erickson & Oppenheimer spent a total of 110.75 hours on Ms. Weyker's case, and Martin Law Office spent a total of 110.4 hours. (See Martin Law Office's Itemization of Attorney's Fees at 3; See also, Erickson & Oppenheimer's Memorandum in Support of Attorney's Fees, ex. 1).

Plaintiff's successor counsel inquired about the pending fee petition on April 9, 2015. (Aff. of Drew J. DeVinney, ¶ 25, ex. 16, Email Correspondence between Timothy Posnanski and Drew J. DeVinney, at 4-5). In response, defense counsel asked successor counsel to disclose the reason Ms. Weyker had changed firms. (Id. at 4). Defense counsel stated that the defendants' biggest issue was the duplication of efforts required by Martin Law Office to get up to speed after substitution. (Id.). Successor counsel responded that he could not disclose the reasons Ms. Weyker discharged Erickson & Oppenheimer without her consent. (Id. at 3). In a later correspondence, dated April 16, 2015, successor counsel informed defense counsel that Ms. Weyker was reluctant to disclose privileged communications, and that he could not advise her to waive her privilege without a further understanding of the relevance of her decision to change firms. (Id. at 2). Successor counsel continued, "[m]aybe if you can give me some more information about what you are looking for, I can talk to her again." (Id.). Defense counsel responded:

> Our review of the materials and our involvement with your firm in this matter leads us to conclude that all of your firm's work was a duplication of efforts undertaken by Erickson & Oppenheimer. Accordingly, our position is that the fees incurred by your firm were unnecessary and would not have been incurred had Ms. Weyker not elected to change law firms. My clients agreed to settle this case and pay reasonable attorneys' fees, but that does not include paying twice for the same legal work. **Ms. Weyker was certainly free to change law firms, but my clients should not have to pay for her decision to do so.**

> With respect to Erickson & Oppenheimer, we would like to know if they were discharged due to unnecessary or improper work that generated the high fees in the fee application. If so, I believe this is a further basis to reduce the fees sought in the application.

(Id. at 1-2) (emphasis added).

Because defendants' position was that they refused to pay for any duplicate work necessitated by Ms. Weyker's discharge of Erickson & Oppenheimer, regardless of her reasons for doing so, and because no other steps were taken by the defendants to resolve the dispute, the parties were unable to stipulate to fees. (Id. at 5). To date, the defendants have not paid Ms. Weyker's attorney's fees, nor have they paid the settlement proceeds promised to Ms. Weyker at the status conference. (See Id.; Aff. of Tanya Weyker at ¶ 10). The matter is now before the Court to resolve.

<u>**ARGUMENT**</u>

"The purpose of § 1988 is to ensure effective access to the judicial process for persons with civil rights grievances. Accordingly, a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 429, 103 S.Ct. 1933. (1983). "A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee. Where settlement is not possible, the fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." 461 U.S. at 437,

## I.    DETERMINING REASONABLE ATTORNEY FEES

In order to determine whether an attorney's fee is reasonable, the district court uses the lodestar method, multiplying the "number of hours reasonably expended on the litigation . . . by a reasonable hourly rate." <u>Pickett v. Sheridan Health Care Center</u>, 664 F. 3d 632, 640 (7th Cir. 2011) (quoting <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

### A.        Reasonable Hourly Rate

A reasonable hourly rate as one that is "derived from the market rate for the services rendered." Id. (quoting Denius v. Dunlap, 330 F.3d 919, 930 (7th Cir.2003)). The applicant bears the burden to produce "satisfactory evidence" that the applicant's rates are "in line with those prevailing in the community." Id. "produc[ing] satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community." Id. (quoting Blum v. Stenson, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)). The presumption is that an attorney's actual billing rate is appropriate to use as the market rate. Picket v. Sheridan Health Care Ctr., 664 F.3d 632, 640 (7th Cir. 2011). If the attorney, however, maintains a contingent fee practice, "then the court should look to the next best evidence-the rate charged by lawyers in the community of 'reasonably comparable skill, experience, and reputation.'" People Who Care v. Rockford Bd. of Educ., 90 F. 3d 1307, 1310 (7th Cir. 1996) (quoting Blum v. Stenson, 465 U.S. 886, 892, 895 n. 11, 104 S.Ct. 1541, 1545, 1547 n. 11, 79 L.Ed.2d 891). If the applicant meets the burden of showing that their rate is reasonable, "the burden shifts to the other party to offer evidence that sets forth 'a good reason why a lower rate is essential.'" People Who Care v. Rockford Bd. of Educ., 90 F.3d at 1313. If the applicant fails to carry this burden, the district court can independently determine the appropriate rate. Montanez v. Simon, 755 F.3d 547, 553 (7th Cir. 2014). Finally, the Wisconsin Rules of Professional Conduct, through its incorporation of the "Hensley" factors, offers additional guidance as to the measure of the reasonableness of fees in Wisconsin:

> The factors to be considered in determining the reasonableness of a fee include the following:
> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;

<div align="center">13</div>

(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent

SCR 20:1.5(a).

### B. Hours Reasonably Expended

Once a court determines a reasonable rate it then looks to the reasonableness of the hours expended. A courts focus is whether the attorney's actions were reasonable. People Who Care, at 1314. Unreasonable hours should not be compensated. Id. A court may not find hours unreasonable solely on the basis that the attorney worked many of his hours in a short period. Id. A rule of thumb is that the hours that an attorney would not properly bill to his or her client in the private sector cannot properly be billed to the adverse party under a fee-shifting statute. Spegon v. Catholic Bishop of Chicago, 175 F. 3d 544, 552 (7th Cir. 1999). However, an attorney is not limited to only the fees for those acts which directly yielded the successful outcome, because "[i]t is not unexpected that some legal research will prove fruitless … and a prevailing party may in appropriate circumstances recover for time spent going down roads that seemed promising but turn out to be dead ends." Montanez v. Simon, 755 F.3d at 555. "The district court has the discretion to decide what research was likely to contribute to a successful claim." Id.

In addition to the reasonableness of the attorney's actions, the court may also look to whether the fee petition is vague or inadequately documented in deciding whether to discount hours. Harper v. City of Chicago Heights, 223 F. 3d 593, 605 (7th Cir. 2000). The court may also look to whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." Montanez, 755 F.3d at 553 (quoting Hensley, 461 US at 435-36.).

Finally, as to paralegal fees, "[t]he only inquiry for requested paralegal fees should be whether the work was sufficiently complex to justify the efforts of a paralegal, as opposed to an employee at the next rung lower on the pay-scale ladder." <u>People Who Care</u>, at 1314.

### C.     Bill of Costs

"Rule 54(d) of the Federal Rules of Civil Procedure creates a strong presumption that the prevailing party will be awarded those costs of litigation identified in 28 U.S.C. § 1920," which include "[f]ees for … transcripts necessarily obtained for use in the case," § 1920(2), "[f]ees … for printing," § 1920(3), and "the costs of making copies of any materials where the copies are necessarily obtained for use in the case," <u>Montanez</u>, at 557; 28 U.S.C. § 1920(4).

## II.     THE ATTORNEY'S FEES GENERERATED IN THIS CASE WERE REASONABLY NECESSARY

During the parties' attempt to resolve the fee dispute, the defendant's did not object to the rates of Ms. Weyker's attorneys, nor did they object to any particular entries. (<u>See e.g.</u>, Email Correspondence between Timothy Posnanski and Drew J. DeVinney). Rather, the defendants' position was that they would not pay for the hours expended by Martin Law Office, because Martin Law Office's fees were necessitated by Ms. Weyker's decision to change firms. (<u>See</u> Id.)

First, the costs, rates, and fees requested by Erickson & Oppenheimer are fully addressed in Erickson & Oppenheimer's Memorandum in Support of Attorney's Fees, which was submitted to the defendants and is attached as Exhibit 18 to the Affidavit of Drew J. DeVinney. For the purpose of this brief, Erickson & Oppenheimer's fee petition speaks for itself.

As to the costs, rates, and fees requested by Martin Law Office, they are supported by the accompanying affidavits of Drew J. DeVinney, Kevin R. Martin, and the declaration of Steven R. McDonald, as well as Martin Law Office's Itemization of Attorney's Fees, which is attached

as Exhibit 17 to the Affidavit of Drew J. DeVinney. As discussed infra, the time expended by Martin Law Office is appropriate given the circumstances of Ms. Weyker's case.

### A. The majority of the work performed by Martin Law Office was not duplicative of the work done by Erickson & Oppenheimer.

Although some of the efforts necessarily taken by Martin Law Office duplicated tasks performed by Erickson & Oppenheimer, the efforts of Martin Law Office could largely be described as picking up where Erickson & Oppenheimer left off.

Erickson & Oppenheimer billed a total of 3.25 hours for what it described as: "reviewing file." (Erickson & Oppenheimer's Request for Attorney Fees and Costs, Ex. 1). It spent an additional three hours reviewing Ms. Weyker's medical records, and a total of 4.75 hours reviewing the discovery from the defendants. (Id.). While Erickson & Oppenheimer prepared for and participated in the depositions, it did not bill for any time spent reviewing the transcripts. (See Id.). In sum, Erickson & Oppenheimer spent a total of eleven hours reviewing the facts of Ms. Weyker's case. Much of Erickson & Oppenheimer's billing was devoted to the drafting of the pleadings, discovery, and other documents submitted to this court. (See Id.).

In addition to devoting even more time to reviewing the discovery, Martin Law Office spent an additional 8.1 hours reviewing the three deposition transcripts, comparing the transcripts with additional client-provided files, and discussing the testimony with the client. (Martin Law Office's Itemization of Attorney's Fees). It also spent another 7.5 hours reviewing, analyzing, and discussing documentation first requested and received by Martin Law Office, which included Ms. Weyker's social media communications and text message history. (See Martin Law Office's Itemization of Attorney's Fees & Explanation of Communication Entries.).

Although some of the legal research conducted by both firms overlapped, namely the review of Kingsland v. City of Miami, 382 F. 3d 1220 (11th Cir. 2004)—which was performed

by Martin Law Office at the request of Ms. Weyker—the billing entries for each firm show that the vast majority of research conducted by the firms was unique. (See, Id. at 1; See also Erickson & Oppenheimer's Memorandum in Support of Attorney's Fees, Ex. 1). Much of the research conducted by Martin Law Office was driven by factual issues uncovered only after the substitution of counsel. (See e.g., Martin Law Office's Itemization of Attorney's Fees, at 2. (Entries dated February 12, 13, and 19)).

In addition to both exhaustive review of the discovery and independent research, Martin Law Office also reviewed and discussed the case with potential experts, including Dr. William T. Gaut; drafted a stipulation to amend the scheduling order in order to timely obtain an expert report; and had multiple communications with Ms. Weyker, defense counsel, and other interested parties on issues that would not have been discussed by Erickson & Oppenheimer. (See Id.; See also Explanation of Communication Entries; See also Erickson & Oppenheimer's Memorandum in Support of Attorney's Fees, Ex. 1). In sum, Martin Law Office did what was reasonably necessary to continue to prepare Ms. Weyker's case for trial. These efforts, in addition to the work previously done by Erickson & Oppenheimer allowed Martin Law Office to adequately review the law and uncover facts related to Ms. Weyker's case such that it was able to advise Ms. Weyker on her decision to accept the offer made by the defendants.

**B.     The fees generated by Martin Law Office for similar work performed by Erickson & Oppenheimer were reasonably necessary.**

1.     Martin Law Office' fees are reasonable because the defendants are placed in the client's shoes, and were aware that Martin Law Office was spending significant time reviewing and analyzing Ms. Weyker's case, but never mentioned the possibility of settlement.

That an attorney expended many hours at the outset of its involvement in a case does not itself make their fees unreasonable. See, People Who Care, at 1314 (stating that a court may not

17

find hours unreasonable solely because the attorney worked many of his hours in a short period.). In fact, shortened time constraints imposed by the circumstances of a case are a factor to be considered in determining whether a higher fee is reasonable. See SCR 20:1.5(a).

A guiding principle in fee shifting statutes is that the adverse party pays the prevailing party's attorney's fees as if it were the prevailing client. See Spegon v. Catholic Bishop of Chicago, 175 F. 3d 544, 552 (7th Cir. 1999) ("hours that an attorney would not properly bill to his or her client in the private sector cannot properly be billed to the adverse party under a fee-shifting statute."). In other words, the question is whether Ms. Weyker would expect to pay Martin Law Office for the work it performed in her case, had she been billed as a private client.

Ms. Weyker was aware that in order for Martin Law Office to properly represent her, it would have to expend many hours at the outset to get caught up with her case. (Aff. of Tanya Weyker at ¶ 7). The defendants were similarly aware that Martin Law Office was expending great effort in reviewing the facts of Ms. Weyker's early on.

The defendants were first put on notice that Ms. Weyker retained Martin Law Office as early as January 12, 2015, when Erickson & Oppenheimer filed its motion to withdraw as counsel, indicating that Ms. Weyker had retained Martin Law Office. (January 12, 2015 Motion by Counsel for Plaintiff to Withdraw, Document 18). The defendants were next put on notice about Ms. Weyker's change in counsel on January 13, 2015, when the plaintiff filed a substitution of counsel naming Martin Law Office as her attorneys. (January 13, 2015 Substitution of Counsel, Document 19). That same day, Martin Law Office contacted defense counsel and requested the deposition transcripts in order to get caught up as quickly as possible, which defense counsel sent to Martin Law Office on January 15, 2015. (See January 15, 2015 Correspondence from Whyte Hirschboeck Dudek, S.C.; Martin Law Office's Itemization of

18

Attorney's Fees at 1; and Explanation of Communication Entries at 1). It should be noted that Martin Law Office expended only 8.8 hours in attorney time and 0.5 hours in paralegal time before defendants were aware that Ms. Weyker had substituted counsel. (See Martin Law Office's Itemization of Attorney's Fees at 1, 3). The vast majority of time spent by Martin Law Office was incurred after defendants knew that Ms. Weyker had hired Martin Law Office. (See Id.).

Martin Law Office was in contact with defense counsel on a regular basis prior to the offer of settlement, including on January 13, January 16, January 30, February 4, February 13, (Id.). However, in all of these correspondences, the possibility of settlement was not brought to the attention of Ms. Weyker's attorneys, who continued to prepare the case in recognition of the Court's scheduling order. The defendants, having been involved in this case since September 5, 2014, were presumably aware of the work that was required by Martin Law Office to get up to speed, considering the amount of discovery that had already been exchanged. (See Disclosure Statement of Defendants Milwaukee County, Clarke, Griffin, Paradise, and Terry, Document 4; and Disclosure Statement of Defendant Quiles, Document 3).

Knowing that Martin Law Office had been investing time into continuing Ms. Weyker's case, the defendants sent the Rule 68 Settlement Offer on February 19, 2015, almost two months after Martin Law Office's first involvement. (See Defendants' Rule 68 Settlement Offer). Regardless of when the defendants made the offer, however, Martin Law Office had a duty to become familiar with the record and other, as of then, unknown facts, before it could competently advise Ms. Weyker as to the defendant's offer.

2.      Successor counsel has an ethical duty to become timely acquainted with the facts
        and law of the case in order to provide competent and diligent representation.

19

Although a settlement occurred within three months of Martin Law Office's involvement in the case, Martin Law Office necessarily had to expend a large amount of time at the outset of representing Ms. Weyker in order to provide competent and diligent representation. In <u>Spegon v. Catholic Bishop of Chicago</u>, 175 F. 3d 544 (7th Cir. 1999), the Court of Appeals upheld a reduction of hours on the basis that the plaintiff's attorney could have met with his client, assessed his claim, called the defendant, and negotiated a settlement within a short period of time. <u>Id</u>. at 551-52. However, in <u>Spegon</u>, the court came to this conclusion based on the defendant's representation that it would have conceded liability immediately, and based upon the simple facts of the case. <u>Id</u>. In the present case, although a settlement offer materialized within two months of successor counsel's involvement, the settlement came in the midst of litigation after initial pleadings, three depositions, and the exchange of lengthy discovery. In order to properly asses Ms. Weyker's claim, successor counsel had to expend significant hours reviewing the record, files, and discovery, and conducting legal research based on independently discovered facts. (<u>See</u> Martin Law Office's Itemization of Attorney's Fees; Trial Scheduling Order, Document 13).

Foreclosing the fees generated by successor counsel in an effort to get up to speed on a case in the midst of litigation creates the dilemma wherein successor counsel's ethical duty to provide competent and diligent representation to the client conflicts with the danger that they would receive no fee for the work they are ethically bound to perform for their client. If the defendants' position was the rule of thumb, then clients who seek to substitute counsel halfway through the litigation of a fee-shifting case, even if client discharged their prior attorney for cause, would be hard-pressed to find subsequent counsel willing to risk the time investment to take their case. This would frustrate the purpose of § 1988, which is to ensure effective access to

20

the judicial process. <u>Hensley</u>, at 429. Moreover, defendant's position does not reflect the reality that, in order to adequately admonish a client as to an offer, successor counsel must diligently gain competent familiarity with the facts and law of the client's case. <u>See</u> SCR 20:1.1, 20:1.3. Competency requires an attorney to possess the "legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." SCR 20:1.1

> **Competent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem**, and use of methods and procedures meeting the standards of competent practitioners. It also includes adequate preparation. **The required attention and preparation are determined in part by what is at stake** …

Id., Comment 5 (emphasis added). Diligence requires a lawyer to act with "promptness in representing a client." SCR 20:1.3.

> [3] **Perhaps no professional shortcoming is more widely resented than procrastination**. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness. A lawyer's duty to act with reasonable promptness, however, does not preclude the lawyer from agreeing to a reasonable request for a postponement that will not prejudice the lawyer's client.

Id., Comment 3 (emphasis added).

In the present case, Ms. Weyker's successor attorneys were ethically bound to review the facts of her case, and to conduct the necessary research to become competently analyze the her particular claims. The need to do so quickly was necessitated because by the scheduling order that had been entered. This ethical duty necessitated the duplication of some of the work conducted by Erickson & Oppenheimer. The test for determining whether time expenditures is reasonable is the same as determining what expenditures a client would expect to pay. A client should expect their attorney to abide by their ethical duties of competence and diligence. Not only should Ms. Weyker have expected Martin Law Office to invest a considerable amount of

time on her case, she was informed that it would do so. (Aff. of Tanya Weyker at ¶ 7). Defense counsel, sharing the same ethical responsibilities as plaintiff's counsel should have been keenly aware of successor counsel's duties to Ms. Weyker, including their duty not to procrastinate on the file. As such, defendants should have anticipated the reasonably necessary fees generated by Martin Law Office in this case.

3.    Duplicative work is not per se unreasonable

The central issue with regard to the time expended by an attorney is whether the attorney's actions were reasonable. People Who Care, at 1314. While fees for duplicative work may be properly disallowed by the court, they are disallowed when they are unreasonable. See Schlacher v. Law Offices of Phillip J. Rotche, 574 F. 3d 852 (7th Cir. 2009). In Schlacher v. Law Offices of Phillip J. Rotche, the court was concerned that "overstaffing cases inefficiently is common, and district courts are therefore encouraged to scrutinize fee petitions for duplicative billing when multiple lawyers seek fees." Id. at 858. This is not what happened in the present case.

As noted, the majority of the work performed by Martin Law Office was not repetitious of the work done by Erickson & Oppenheimer. While defendants have not yet itemized what they believe to be the duplicative work, any duplicated tasks were not due to the overstaffing or inefficiency of the attorney's involved. Rather, it predictably existed when Ms. Weyker chose to continue with her case. Ms. Weyker and Erickson & Oppenheimer had a parting of the minds as to the viability of her case. (Aff. of Tanya Weyker at ¶ 5). Because Erickson & Oppenheimer's analysis of the case would have yielded a less successful result, Ms. Weyker benefited by hiring successor counsel to continue her case. (See, Id. at ¶ 6, 10). Further, Ms. Weyker believes that Martin Law Office's review of her case was necessary to assist her in evaluating the defendants'

offer. (Id. at ¶ 6). Because the necessary duplicative work, namely Martin Law Office's review of the discovery and file, benefited the client, it cannot be considered unreasonable.

## CONCLUSION

For the forgoing reason, the plaintiff respectfully requests the court to award the fees requested by the plaintiff's attorneys in this case.

Dated at Oak Creek, Wisconsin, 19th day of June, 2015

<div style="margin-left: 50%;">

Respectfully Submitted,

MARTIN LAW OFFICE, S.C.
Attorneys for Plaintiff Tanya Weyker

/s/ Drew J. De Vinney
_____
Kevin R. Martin
State Bar No. 01045748
Drew J. De Vinney
State Bar No. 01088576

</div>

ADDRESS
7280 S. 13th St., Ste.102
Oak Creek, WI 53154
414-856-2310 (office)
414-856-2315 (fax)
kevin@martin-law-office.com
drew@martin-law-office.com